# THE SUPREME COURT

### OF THE

# STATE OF NEVADA

## JULY TERM, 1910

[No. 1885]

THERESA BARNES, RESPONDENT, *v.* CITY OF
CARSON, APPELLANT.

1. MUNICIPAL CORPORATIONS—EXCAVATIONS IN STREETS—LIABILITY
OF CITY.

In an action against a city for personal injuries resulting
from plaintiff's falling into an excavation made in a street,
although the act of incorporation of the city may have given
to the city trustees exclusive power to regulate its streets,
drains, etc., yet where it appeared that for some years the city
had paid the bills which were approved by the city trustees for
street work done by the city marshal and had permitted him to
do such work, it must be presumed that it authorized him to
make the excavation in question rendering the city liable for
his negligence.

APPEAL from District Court of the First Judicial District of the State of Nevada, Ormsby County; *John S. Orr*, Judge, presiding.

Action for personal injuries by Theresa Barnes against the City of Carson. Judgment for plaintiff, and defendant appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

VOL. 33—2

*Roberts & Sanford* and Summerfield & Curler (*Robert Richards*, of counsel), for Appellant:

Conceding, for the time being only, that it was the legal duty of the city to repair and maintain the sidewalk or culvert in question, yet, if the court should hold, as we believe it will, that the acts of Mr. Kinney and Mr. Lafreniere were *ultra vires* in the premises, and that therefore the doctrine of *respondeat superior* cannot be made to apply, the defendant is not liable to the plaintiff, and upon the record the case must be reversed, for the following reasons:

*First*—The plaintiff will then be bound in law by her pleading, and the gist of the cause of action must then be based upon the omission by the city to perform a legal duty, whereas the gist of the action as laid in the complaint is based upon the alleged performance of a lawful act in an unlawful manner; and

*Second*—The plaintiff will then be bound in law by the evidence, or, rather, the absence of evidence, in the case, in this: There is no evidence in the record showing or tending to show in the least that the defendant had any knowledge or notice, either actual or constructive, of the condition of the sidewalk or culvert, or of the existence of the excavation into which plaintiff fell.

So, therefore, if Mr. Kinney and Mr. Lafreniere were acting *ultra vires*, or the city is not responsible for their acts, as we will hereinafter show, the city is not liable to plaintiff under the condition of the record as it exists in this court, for the element of defendant's negligence will be absent both in pleading and proof; and as was said in *Arndt* v. *City of Cullman*, 132 Ala. 520, 90 Am. St. Rep. 925: "It was incumbent on plaintiff in order to maintain the action to aver and prove express notice of the alleged defect in the sewer, or facts from which it might be inferred that the corporate authorities were properly chargeable with constructive notice thereof."

In *Smith* v. *Mayor*, 66 N. Y. 295, 23 Am. Rep. 53, this language is used: "There was no evidence and there is no finding that the sewer was liable to become obstructed

under ordinary circumstances, so as to require the watch and care of the officials to prevent it becoming filled and choked with the wash of the street, or that it had been obstructed for any time and under circumstances from which it might be assumed that the officers of the city did know or ought to have known the fact. The city does not insure the citizen against damage from the works of its construction, but is only liable, as other proprietors, for negligence or wilful misconduct. The principles upon which municipal corporations are held liable for damages occasioned by defects in streets and sewers and other public works are well settled by numerous cases, and the liability is made to rest, in any case, upon some neglect or omission of duty (*Barton* v. *Syracuse*, 37 Barb. 292, 36 N. Y. 54; *Griffin* v. *Mayor of New York*, 5 Seld. 456; *McCarthy* v. *Syracuse*, 46 N. Y. 194; *Nims* v. *Troy*, 59 N. Y. 500), and the judgment must be affirmed."

It is stated in *City* v. *Weger*, 66 Pac. 1070: "Appellee had judgment against appellant for damages on account of injuries sustained by a fall on a defective crosswalk in the city of Boulder. The defect was a board about eight inches wide missing from a wooden crosswalk. To justify affirming this judgment the evidence must show that 'the city had knowledge, either actual or constructive, of the existence of the defect, and had not exercised proper diligence in its repair.' (*City of Denver* v. *Moewes*, 60 Pac. 986.) It must appear that 'defendant had notice of such obstruction, or that it had existed for such a length of time as to impart notice, and that defendant had not used reasonable diligence in removing such obstruction.' (*City of Boulder* v. *Niles*, 9 Colo. 415, 12 Pac. 632.)

See, also, *Lewisville* v. *Batson*, 29 Ind. App. 21, 63 N. E. 861; and Thompson's Com. Law of Neg. vol. 5, sec. 6170, which lays down the rule that "a municipality is not liable for injuries caused by unguarded obstructions placed on its sidewalks by third persons, without authority, unless it has either actual or constructive notice thereof."

We come now to the errors appearing in the record urged on this appeal.

We contend that from the facts in the case the defendant is not liable to the plaintiff for the injuries sustained.

This proposition is reserved in the transcript in divers forms, namely, first, in the motion for a nonsuit and the exception to the denial thereof; second, in the notice of intention to move for a new trial upon the grounds therein specified; and, third, in the specific assignment of errors relied upon by the defendant; in consequence of which, we urge:

*First*—That the evidence is insufficient to justify the verdict and judgment, and that the same are against law; and

*Second*—That the verdict of the jury and the judgment of the court are not supported by the evidence and are contrary to the same.

We are well aware that the appellate court is not called upon to consider the weight of the evidence when there is any evidence to support the verdict, and that it will not disturb the verdict where there is a conflict of evidence, as these are matters for the lower court; but the rule is otherwise where there is no evidence to support the verdict, and then it is the duty of the appellate tribunal to reverse the case, and grant a new trial.

The undisputed facts appearing from the evidence, in so far as they relate to the powers and duties of the city marshal or his employees, are that Mr. Kinney at the time of the accident occurring to plaintiff, and prior and subsequent thereto, was the duly elected, qualified and acting sheriff of Ormsby County, and by virtue of that office and deriving his authority therefrom, he was the ex officio city marshal of Carson City, and on that date, and prior and subsequent thereto, Mr. Lafreniere was hired and employed by him to work upon the streets of the city in repairing breaks and culverts and on work required to be done upon the streets and alleys of the defendant; that Mr. Kinney delegated the authority to Mr. Lafreniere, and that neither the city council of Carson, nor the city, nor any of its officers, ever had any

control or direction of the duties of Mr. Kinney or Mr. Lafreniere, or ever undertook such control or direction.

Such being the testimony of Mr. Kinney and Mr. Lafreniere in that regard, it becomes necessary to examine the statute and amendments thereto incorporating the city, and the ordinances thereunder, admitted in evidence, and to ascertain therefrom to what extent the powers and duties of the city marshal and his employees have been defined. The statute and amendments referred to are the following: An act entitled "An act to incorporate Carson City," approved February 25, 1875 (Stats. 1875, p. 87), the act amendatory thereof, approved March 2, 1877 (Stats. 1877, p. 117), the act amendatory thereof, approved March 5, 1879 (Stats. 1879, p. 67), and the act amendatory thereof, approved March 6, 1889 (Stats. 1889, p. 68).

The only reference to the city marshal and his employees, or to their powers and duties, are the following:

*From the Act of 1875:* "SEC. 10. The board of trustees shall have the power:

"Fourteenth—To cause the city marshal to appoint one or such number of policemen, as they shall from time to time determine, who shall be under the direction and control of the city marshal.

"SEC. 14. The sheriff of Ormsby County shall, in addition to the duties now imposed upon him by law, act as the marshal of the city, and shall be ex officio city marshal.

"SEC. 27. The city marshal, in addition to the general duties of his office, shall execute all process issuing from the recorder's court, act with full powers as a policeman, and as chief of all the police force appointed for the city as such, and shall collect all taxes upon city licenses. In his absence the under sheriff shall act as city marshal.

"SEC. 30. The powers and duties of the city marshal may be more fully defined by such ordinances as shall not be inconsistent with this act."

*From the Acts of 1877, 1879 and 1889:* "SEC. 10. The board of trustees shall have the following powers:

"To cause the city marshal to appoint one or such number of policemen as the board of trustees shall from time to time determine, who shall be under the direction and control of the marshal, as head of the police force of said city; but such appointment shall have no validity whatever until the same shall have been approved by said board of trustees; and said board of trustees shall have power to remove any such policemen from office, at pleasure, upon good cause shown, and, upon a charge being preferred, to suspend until the same shall have been passed upon finally."

It is evident, therefore, that under the act incorporating the city, and the amendments thereto, the duties of the city marshal are merely the general duties of a peace officer, and that the organic law of the municipal corporation gives him no authority or power to superintend or repair streets, or bind the city, by contract or otherwise, in any matter whatsoever; and he can have no general power or authority, and certainly none beyond the scope of his duties as a peace officer, for the unanswerable reason, if for no others, that, as aforesaid, it is provided by section 30 of the act that "the powers and duties of the city marshal may be more fully defined by such ordinances as as shall not be inconsistent with this act." In the absence of a more full definition of his powers and duties, he is limited by the express provisions of the act and its amendments, and when he exceeds the authority granted him thereunder, as he has done in this case, he does not act even *colori officii,* but is a common tort feasor, and the city does not assume any responsibility, and cannot be bound, for any injuries sustained while he so acts.

The question then presents itself: Has the board of trustees by the ordinances admitted in evidence made such a more full definition of the powers and duties of the city marshal, and if so, is the same applicable to the facts of this case? This question cannot be better answered than by quoting these ordinances *in extenso.*

## ORDINANCE NO. 5

" *The Board of Trustees of Carson City do ordain:*

"SECTION 1.   No person or business firm shall place or cause to be placed upon any street, sidewalk, square or thoroughfare, any box, bale, lumber or any other thing, of any nature whatsoever, so far as to obstruct the same, excepting only for the display of goods, wares and merchandise; *provided,* that any person erecting or repairing any building may occupy and use the sidewalk and one-third of the street in front thereof for such time as is necessary for the depositing of material required for the construction or repair thereof; *and provided further,* that for the purpose of displaying goods, wares and merchandise, two feet in width, commencing at the front line of the lot, may be used; *provided,* that a space of six feet in width shall at all times be kept clear for the accommodation of persons passing; *and provided further,* that merchants and others receiving and delivering goods shall be allowed six hours from the time they are deposited until they are removed.

"SEC. 2.   Any person by whom or under whose direction or authority any portion of a public street, alley or sidewalk may be made dangerous, shall erect, and so long as the danger may continue, maintain around the portion of the street, alley or sidewalk so made dangerous, a good and substantial barrier, and shall cause to be maintained during the night, from sunset till daylight, a lighted lantern at both ends of such portion of the street, alley or sidewalk so made dangerous.

"SEC. 3.   No person shall in any manner or for any purpose break up, dig up, disturb, undermine or dig under, or cause to be dug up, broken up, disturbed, undermined or dug under, any public street, highway or place, or fill in, put, place thereon, or deposit in or upon any public street, highway or place, any earth, sand, dirt, clay, manure or rock, without the permission of the board of trustees being first had and obtained.

"SEC. 4.   Any person who shall violate any of the provisions of this ordinance shall be deemed guilty of a mis-

demeanor, and upon conviction thereof, shall be fined in any sum, not less than five dollars nor more than two hundred dollars, or be imprisoned in the county jail not more than two nor more than one hundred days, or be both so fined and imprisoned."

## ORDINANCE No. 30

" *The Board of Trustees of Carson City do ordain:*

"SECTION 1. Ordinance No. 23, providing for a special policeman for Chinatown, etc., adopted June 7, 1875, is hereby repealed.

"SEC. 2. This ordinance shall take effect on and after the first day of April, 1876."

## ORDINANCE No. 31

" *The Board of Trustees of Carson City do ordain:*

"SECTION 1. All owners of buildings and lots, or either, fronting to the west, on the east line of Carson Street, between Washington Street and Sixth Street, shall lay down, within sixty days after the passage of this ordinance, a good and substantial sidewalk in front of their said property. Said sidewalks shall be ten feet wide at all places, and of uniform grade in each block, as nearly as practicable. All sidewalks now laid down, within the limits hereinabove described, which do not conform to the above-named requirements, must be made to conform thereto within the above required time.

"SEC. 2. All owners of buildings or lots, or either, in said city, fronting to the east, on the west line of Carson Street, between Washington Street and Sixth Street, shall lay down, within sixty days after the passage of this ordinance, a good and substantial sidewalk in front of their said property. Said sidewalks shall not be less than eleven and three-quarters nor over twelve feet wide at all places, and of uniform grade in each block, as nearly as practicable. All sidewalks now laid down within the limits in this section specified, which do not conform to the hereinabove specified requirements, must be made to conform thereto within sixty days after the passage of this ordinance.

"SEC. 3.    Sleepers used in laying down sidewalks required by this ordinance shall not be less than three by six inches in size, of sound material, well placed, not more than three feet apart, and firmly supported; and the planking used thereon shall not be less than eleven and three-quarters nor over twelve feet long, on the west side, and ten feet long on the east side of said street, not less than two inches thick, not more than six inches wide, of sound material evenly laid, and thoroughly spiked to the sleepers.    Awning posts on all sidewalks shall be placed within three inches of the outer edge thereof, and shall be thoroughly spiked and secured at base and crown.

"SEC. 4.    Brick or stone may be used, if of suitable quality, in laying down sidewalks, but must be made to lie evenly, and of width and grade as hereinabove specified.

"SEC. 5.    Sidewalks in said city shall be kept in good condition by the owners of the property in front of which they are, at their own expense, and such owners shall be liable to the city, and to any injured party, for all damages arising from failure so to keep sidewalks in good condition for safe use thereof, as above required.

"SEC. 6.    For the purpose of carrying out and enforcing the foregoing provisions of this ordinance, the city marshal is hereby made inspector of sidewalks in said city, and it shall be his duty as such inspector, subject to the board of trustees of said city, to see that suitable and proper material be used, sleepers laid at proper distances from each other, and placed securely, the required size of sleeper and plank used, the prescribed width and grade observed in laying said sidewalks, and that the provisions of this ordinance be in all respects carried out.    In the discharge of said duties, said inspector shall have the power and privilege to call to his assistance such aid as he may need, in the way of experts, for whose services, when rendered, the city shall pay a reasonable compensation.

"SEC. 7.    If any owner of any house or lot, or either, within the limits defined by this ordinance, shall fail to lay down a sidewalk in front thereof, or to make the sidewalk,

if any, already laid down in front thereof, conform to the requirements of this ordinance, within the time herein specified the city marshal shall, unless otherwise directed by the board of city trustees, lay down such sidewalk, or cause that already laid down to conform to the requirements of this ordinance without delay, and the necessary expense of so doing shall be a lien upon the house and lot, or either, in front of which sidewalk shall be so laid down, or made to conform to the requirements of this ordinance; and the same shall be recovered by action of said city against said property, and the owner or owners thereof, in any court of competent jurisdiction."

The contention of appellant, that these ordinances do not define the powers and duties of the city marshal so as to make them applicable to the case at bar, could, with propriety, be considered in conjunction with the contention hereinafter made that the lower court erred in admitting these ordinances in evidence over objection; and should this tribunal hold that these ordinances do not make any such definition of the powers and duties of the city marshal, then it follows as a logical sequence that the objection of the defendant to their introduction taken at the trial should have been sustained. So, in determining this latter contention, our views in this part of the brief presented are urged as additional reasons why this court should hold, as hereinafter maintained, that the lower court erred in admitting these ordinances in evidence, and that such ruling constitutes reversible error.

We can relegate Ordinance No. 30 from this discussion without comment, as it can throw no light upon the subject whatever; and Ordinance No. 5 requires but short consideration. This ordinance is general in its terms and penal in its entirety. Section 1 thereof prohibits the obstruction of streets and sidewalks by merchants and other persons, and gives those erecting or repairing buildings the privilege of using a designated portion of the street and sidewalk for the deposit of necessary material thereon. Section 2 thereof requires any person, by whom or under whom a street or sidewalk is obstructed, to guard

the same with suitable barriers, and to place at the same lighted lanterns during the night, while such obstruction continues.   Section 3 thereof prohibits the digging or disturbing of any street, highway or place, or placing or depositing thereon earth, sand, rocks or dirt, without the permission of the board of trustees; and section 4 thereof prescribes a penalty for the violation of the ordinance.

Surely, it cannot be said that this ordinance defines the powers and duties of the city marshal in any respect whatsoever, and its competency, relevancy and materiality as a feature in the case cannot be urged with any force or success.   If the action were a personal action against Mr. Kinney, or Mr. Lafreniere, to recover damages for the action laid in the complaint, it might well be said that their violation of this ordinance might be an element tending to fix the amount of their liability to the plaintiff.   If the plaintiff can recover in this case, it is only under the doctrine of *respondeat superior*, and this ordinance cannot tend to establish the relation of principal and agent or of master and servant, between the city on the one side and Mr. Kinney and Mr. Lafreniere on the other, in any degree whatever.   Hence, Ordinance No. 5 is also eliminated from the case.

There only remains, then, Ordinance No. 31 under which to define the powers and duties of the city marshal as applicable to the case at bar, but for that purpose it can afford no aid.   This ordinance contains seven sections, and is entitled "An ordinance in relation to sidewalks."   Sections 1, 2, 3, 4 and 7 thereof have no bearing upon the question here involved, as they appertain exclusively to sidewalks for Carson Street, between Washington and Sixth Streets, in the city, section 7 thereof particularly providing that "if any owner of any house or lot, or either, within the limits defined by this ordinance," *i. e.*, Carson Street between Washington and Sixth Streets in the city, "shall fail to lay down a sidewalk," etc., and continuing by providing certain duties of the city marshal in that event, and certain consequences to the property and the owners thereof within said limit.

Since none of the sections named can be construed to control or even appertain to the work at the corner of Curry and Telegraph Streets, Carson City, where the injuries were sustained by plaintiff, it is expedient to analyze sections 5 and 6 of this ordinance. These, by no intendment, nor by any rule of statutory construction, can be held to define the powers and duties of the city marshal to any extent other than to inspect the kind and grade of material to be used in sidewalks, and the detailed methods in the construction thereof as prescribed in the ordinance, and certainly not to the extent of requiring or even permitting the city marshal without let or hindrance to lay, or construct, or repair sidewalks throughout the city.

By section 5 of the ordinance the duty is imposed upon property owners to keep their sidewalks in good condition, and for failure so to do, they are made liable in damages, and by section 6 thereof it is provided that " for the purpose of carrying out and enforcing the foregoing provisions of this ordinance, the city marshal is hereby made inspector of sidewalks in said city; and it shall be his duty, as such inspector, subject to the board of trustees of said city, to see that suitable and proper material be used; sleepers laid at proper distances from each other, and placed securely; the required size of sleepers and planks used; the prescribed width and grade observed in laying said sidewalks, and that the provisions of this ordinance be in all respects carried out. In the discharge of said duties, said inspector shall have the power and privilege to call to his assistance such aid as he may need, in the way of experts, for whose services, when rendered, the city shall pay a reasonable compensation."

It appears from this last section that each duty of the city marshal in relation to sidewalks is specifically enumerated, and no duty omitted can be regarded as included therein, but, by operation of law, it must be held to be excluded therefrom under the well-settled rule: *inclusio unius, exclusio alterius.* Moreover, the phrases in the

latter part of the section, namely, in the discharge of said duties, *i. e.*, duties elsewhere above enumerated, and, in the way of experts, import and imply that the powers conferred and the duties imposed by that section are merely such that permit and require the city marshal to inspect the kind and grade of material and the detailed methods of construction as prescribed in the ordinance, and certainly not to permit or require him to construct or repair sidewalks throughout the city, as aforesaid.

However, let the interpretation of this ordinance be as it may, it relates simply and exclusively to sidewalks, and we are concerned here with a flooded sewer, drain or ditch, and the excavation therefrom made to repair the same. No matter what powers can be said to have been conferred or duties imposed by the ordinance upon the city marshal, relating to sidewalks, those powers and duties cannot be extended to include the performance of the work alleged in the complaint by the city marshal or by those whom he should employ for that purpose.

It is apparent, we think, that whether the excavation in question be regarded as a repair to a sidewalk, or a repair to a drain, ditch or sewer, no power was conferred, or duty imposed, either upon Mr. Kinney, as city marshal, or upon Mr. Lafreniere, employed by him, by statutory enactment, city ordinance, or by direction of the executive officers of the municipality, and without such authority, and the direction and control of the work undertaken by Mr. Kinney and Mr. Lafreniere, as appears from the evidence here, the doctrine of *respondeat superior* cannot be made to apply, and the city is not liable for the injuries sustained, for their acts in the premises were *ultra vires*, which made them common tort feasors, and for which they alone are responsible in damages to the plaintiff. (28 Cyc. pp. 1274, 1276, 1278; 20 Am. & Eng. Ency. Law, pp. 1199, 1200, 1201, 1202.)

It was said in *McDonough* v. *Mayor*, 6 Nev. 95: "It is manifest from what is said that the plaintiff must allege and prove that the street where the injuries resulted was opened by the city, and that the pitch or defect was

made by it, or that it was left in that condition when the street was opened. These facts are not alleged in the complaint, nor were they proven at the trial. The judgment must be reversed."

A case very similar to the facts presented on this appeal was decided by the Supreme Court of Maine in 1902, being entitled *Bowden* v. *The City of Rockland,* and reported in 11 Am. Neg. Rep. 429, *et seq.* It appeared there that a wall along a public highway proved insufficient and collapsed, and it became necessary to build a new wall to make the highway safe, within the statute. To do this required the wall to be built partly, at least, upon land outside of the limits of the highway, and accordingly the owners of the land and the quarry sent to the city council a written license to build and maintain such a wall, and to take the materials from the quarry. The street railway also using the highway stipulated with the city in writing to bear part of the expense. The city engineer made a plan for the work, and undertook the building of the wall in accordance therewith, and during the course of construction thereof a boom slipped and plaintiff was injured, for which he sought to mulct the city in damages upon the ground that the slipping of the boom and his consequent injury resulted from the negligence of the street commissioner in setting up the derrick, and that in setting up the derrick the street commissioner was the agent of the city and was not then acting as a public officer in the performance of official duty. The court said:

"Rebuilding the retaining wall on a larger scale than the old (that being necessary to make the way safe and convenient) was clearly within the statutory powers of the street commissioner, at least after the city had provided funds and a place therefor. It is well settled, by decisions too numerous and familiar to require citation, that a highway surveyor or street commissioner in repairing ways is, and acts as, a public officer, and the municipality, within whose limits he acts and which appointed him and furnished him funds for the work, is not liable

for his torts, unless it has interfered and itself assumed control and direction of the work, and of the surveyor or commissioner.    Has the city thus interfered and assumed control and direction in this case? is the pivotal question.

"While some persons, probably city officers, in behalf of the city, procured the written license of the quarry owners, and also a stipulation from the street railway company to bear part of the expense of rebuilding the wall, it does not appear that the city council ever passed a vote in the matter.    No directions appear to have been given by vote of the ·city council, or the committee on streets, to the city engineer to prepare plans.    So far as appears, he did so *suo motu*, as part of his regular work, or at the request of some officers.    The plaintiff, however, claims that the mayor and one or more of the committee on streets gave the street commissioner orders to build the wall, and that he acted under those orders, and not under his statutory authority.    We do not think that plaintiff's own evidence shows so much.    There appears to have been some question in the mind of the street commissioner as to his authority to build the wall as street commissioner, in view of all the circumstances. He consulted the mayor, the city solicitor, and members of the committee on streets, and they assured him that he had the authority as street commissioner, and told him to go ahead and build the wall.    He then proceeded with the work as above described.

"It must be apparent that this is not enough to show that the· city assumed the control and direction of the work and of the commissioner, reducing him from a public officer to a mere employee of the city.    At most the various officials with whom he talked merely assured the commissioner that he had authority and the duty to build the wall, and told him to go ahead and exert his authority, and to do his duty, 'and it would be all right.'    This case is more within *Barney* v. *City of Lowell*, 98 Mass. 570, and *Prince* v. *City of Lynn*, 149 Mass. 193, 21 N. E. 296, in which cases the city was held not liable for the negli-

gence of the street commissioner, though he was acting under the city charter.

"That the city obtained the license from the quarry owners to use their land and materials was not a usurpation of the street commissioner's authority, and did not oust him from the control and direction of the work of rebuilding, no more than if the city had condemned the land and material. The arrangement for the street railroad company to bear part of the expenses had no effect upon the status of the street commissioner, no more than arrangement to raise the money by loan or tax. That the plan for the wall was made by a city employee (the city engineer) did not make the city the owner or director of the work.

"We do not say that if the mayor, city solicitor, or members of the committee on streets, or all combined, acting of their own volition, without vote of the council, had specifically assumed control and direction of the work and of the commissioner, such act of theirs would have made the commissioner a mere agent of the city, and the city his principal, answerable for his torts. It was said in *Woodcock* v. *City of Calais*, 66 Me. 234, on page 236, citing *Haskell* v. *City of Bedford*, 108 Mass. 208, that the orders which the street commissioner may have received from the mayor or city solicitor could not affect his relative status to the city, and could not bind the city in respect to the commissioner's acts. In *Goddard* v. *Inhabitants of Harpswell*, 88 Me. 238, 33 Atl. 980, it was held that the selectmen, without vote of the town authorizing it, could not make themselves agents of the town in matters of highways.

"In this case it is enough to say that the evidence does not show that the city, through the action of any legally constituted authority, had so far assumed control and direction of the work of rebuilding the wall, and of the street commissioner, as to make his negligence in setting up the derrick the negligence of the city."

The facts of the case at bar are even stronger in appel-

lant's favor than those appearing in the foregoing decision. There the city authorities did take some active interest, if not an active part, in the work in hand, to the extent that the city engineer prepared the plans, the license from the quarry owners inured to the benefit of the municipality, and the executive officers thereof were consulted about the work, and at least verbally sanctioned it, yet such things done on behalf of the city did not establish in law that the city had, or had assumed, any authority, control or direction over the rebuilding of the wall or over the street commissioner; while it appears from the record on this appeal that the city neither expressly nor impliedly, nor did any of its executive officers, authorize, direct or control any of the acts of the city marshal or any of his employees in any matter whatever; but on the contrary it affirmatively appears that neither Mr. Kinney nor Mr. Lafreniere was empowered or obligated, by statute, ordinance, resolution or verbal direction of or on behalf of the defendant, to make the excavation in question, or to repair the drain, ditch, sewer or sidewalk mentioned in the complaint; and that Mr. Kinney assumed exclusive jurisdiction over that character of work, but under what designation or grant of power he did so it does not appear, and it cannot be ascertained; and that he employed whomsoever he saw fit, and did not suffer the city, nor any of its officers, to direct or control him in the least.

As has been well said in the case of *Hilsdorf* v. *City of St. Louis,* 45 Mo. 95, 100 Am. Dec. 352: "The rule that prescribes the responsibility of principals, whether private persons or corporations, for the acts of others is based upon their power of control. If the master cannot command the servant, the acts of the servant are clearly not his. He is not master, for the relation implied by that term is one of power, of command; and if a principal cannot control his agent, he is not an agent, but holds some other additional relation. In neither case can the maxim, *respondeat superior,* apply to them, for there

is no superior to respond." While we have made this excerpt from this case, as we deem it in point, we will further discuss this decision.

It appears from the opinion that the stables of the St. Louis Railroad Company were consumed by fire, and one hundred and forty mules therein destroyed, and their carcasses left more or less burned. The weather was warm, and, obviously, it became necessary to remove them at once. The city had previously legislated concerning the removal of carcasses, and pursuant to such legislation had granted the exclusive privilege to certain designated persons, which privilege was in force at the time of the fire. On the morning of the loss by the railroad company the clerk of the board of health received the proper notice from the company under the ordinance, and one Settle, employed by those who had the privilege, appeared on the scene for the purpose of removing the carcasses, and there met the mayor of the city. On account of the distance it was at once apparent that the removal could not be made to the usual place, and that Settle had no means of consummating the removal, and informed the mayor that it would take him a week to do the whole job. The mayor then obtained a proposition from him to throw them into the river at a designated place for a specified price per head, which was communicated to the railroad company, which afterwards paid the aggregate amount. The carcasses, having been dumped into the river, the current did not strike them as supposed, and they sank into plaintiff's quarry; on which account he was denied the use thereof, and prosecuted an action for damages against the city of St. Louis and the railroad company. The court said:

"The defendants made separate defenses, and after the evidence was submitted, counsel for the city asked the court to instruct the jury that, on the facts proved, the plaintiff could not recover against it. This instruction the court refused to give, and thus the question is raised whether, under the facts claimed to be proved by the plaintiff, the city is liable to him for the damage arising

from the acts of Settle.   If the city is thus liable, the liability arises by virtue of its relation to the mayor and to Settle, or to one of them.   The responsibility of an employer for those in his service depends upon the character of their acts, and especially upon their relation to the service.   It would not be right to charge him for the torts of his servant that had no relation to his employment.   The contract of service is no guaranty of general good conduct as a citizen, but any act done in pursuance of the contract of hire will in general charge the principal as well as the agent or servant.   Corporations, whether municipal or aggregate, are now held to the same liability as individuals, and will not be permitted to screen themselves behind the plea that they are impersonal, and their acts are but the acts of individuals; and if an agent or servant of a corporation, in the line of his employment, shall be guilty of negligence and commit a wrong, the corporation is responsible in damages.

"In the case at bar, the mayor, it appears, acted with zeal and energy to save the public from the effects of the terrible nuisance upon the premises of the railroad company.   But he cannot be said to have been acting upon behalf of the city, but rather as a good citizen, whose other heavy responsibilities were a spur to look after the public welfare generally.   The general duty of abating nuisances is imposed by article 1 of said ordinance 4894, especially by sections 6 and 7, upon the board of health, and the street inspectors under its direction, and it does not appear that the mayor has anything to do with the matter.   The matter did not come before the board of health, nor does it appear that the mayor undertook to bind the city, or that he acted officially in the premises. But if he did, he went beyond his authority as mayor, and his acts were not those of the city.   (*Thayer* v. *Boston,* 19 Pick. 511, 31 Am. Dec. 157.)

"The suggestion that Settle did not remove these carcasses under this contract of his employers, but by special direction of the mayor, only brings us back to the first proposition, that the mayor had no authority to give any

such direction, nor does it appear that he acted officially, but, as we shall presently see, effected between Settle and the railroad company an arrangement for their removal.

"The judgment, being against both the city and the railroad company, when it should have been against the railroad company alone, is reversed and the cause remanded."

As, from the record here, it appears that the power over drains, ditches, sewers, sidewalks and culverts, is reserved by law to the board of trustees of the city of Carson, and that the city marshal usurped the functions of that board in making the alleged repairs, and as it nowhere appears that the board had any knowledge of the condition of the drain, sidewalk, ditch, sewer or culvert, or of the excavation, mentioned in the complaint, we believe that the rules laid down in the case last quoted from are strongly applicable for a proper determination of this appeal, and, paraphrasing an expression in that decision contained, we declare with confidence that the matter of those repairs did not come before the board of trustees, nor does it appear that the city marshal undertook to bind the city, or that he acted officially in the premises. But if he did, he went beyond his authority as city marshal, and his acts were not those of the city. (19 Pick. 511; 31 Am. Dec. 157.)

The rule is thus stated in *Caspary* v. *The City of Portland*, 20 Am. St. Rep. 845: "It will thus be seen that, on general principles, it is necessary, in order to make a municipal corporation impliedly liable, on the maxim of *respondeat superior*, for the wrongful acts or negligence of an officer, that it be shown that the officer was its officer, either generally or as respects the particular wrong complained of, and not an independent public officer; and also that the wrong was done by such officer while in the legitimate exercise of some duty of a corporate nature which was devolved upon him by law, or by the direction or authority of the corporation." (2 Dillon on Municipal Corporations, sec. 974.)

As was said in *Gould* v. *City of Topeka,* 4 Pac. 828: "Courts should not allow any but the most formal evidence to be introduced to prove that the city authorities had planned, or ordered or ratified, any such dangerous place within their streets. Courts should not presume without formal proof that the governing board of a city had deliberately done wrong."

"There was no evidence showing that the city, by its council or otherwise, had ever expressly planned or ordered that the street where plaintiff's injuries occurred should be made or left in the condition in which it then existed; and the evidence does not show that the city, by its council or otherwise, ever expressly ratified any such condition of the street. The only evidence upon this subject was that the street had remained in that condition for some years, and that the mayor and two members of the city council had knowledge of its condition. The judgment of the court below will be reversed, and the cause remanded for a new trial."

It is with some degree of confidence that we bring this topic of our brief to a close. There is no evidence of essential elements in the case to enforce liability against the defendant in this appeal. We have established that unless the city itself undertook the work, or duly authorized it, or that it was done by the city marshal empowered by either statutory enactment, municipal ordinance, or express authority, control and direction of the executive officers of the defendant, the plaintiff cannot recover in the action. It is evident, from the discussion we have made, that the city did not undertake, nor authorize, the work, and that the city marshal was not empowered as aforesaid, or at all, but acted in the premises, under supposed legal right, no doubt, yet, of his own volition, unauthorized, undirected and uncontrolled. Applying the law to this situation, as it is, and as we have laid it down, the evidence is insufficient to support the verdict, and the motions for nonsuit and for a new trial should have been granted, as of course.

In conclusion, without further quotation or argument,

we cite: *Kansas City* v. *Brady*, 34 Pac. 884; *Sievers* v. *San Francisco*, 47 Pac. 687; *Mitchell* v. *Rockland*, 41 Me. 363, 68 Am. Dec. 252; *Thayer* v. *Boston*, 19 Pick. 511, 31 Am. Dec. 157; *Hilsdorf* v. *City of St. Louis, supra*, 100 Am. Dec. 352, and the extended monographic note following the opinion; *Goddard* v. *Inhabitants*, 30 Am. St. Rep. 373, and the extended monographic note following the opinion; Barrows on Negligence, secs. 180, 181.

Leaving the proposition last presented, we now contend that the lower court erred in admitting in evidence over defendant's objections Ordinances Nos. 5, 30, and 31. The objections to their introduction and the exceptions reserved to their admission are very specific, when it would have been sufficient to have stated that each of those ordinances was incompetent, irrelevant and immaterial. Hence, it is unnecessary here to incorporate such objections and exceptions.

If the reason or motive for the introduction of the ordinances on behalf of plaintiff were desired, it could be readily ascertained by a mere reference to the transcript. It will be noted that only after the motion for a nonsuit was argued, submitted and denied, then, under leave of court, the plaintiff reopened her case, and over objection introduced the ordinances in question. It evidently appealed to plaintiff that the denial of that motion afforded no security, in that a material and essential element in her proof was lacking, namely, the power and duties of the city marshal in the premises, and though there was, and could be, no proof to supply that element, yet it was incumbent upon her, at least, to attempt to supply the same, and in making that attempt she caused these ordinances to be introduced in evidence. However, we have shown hereinabove that the ordinances referred to confer no power and impose no duty upon the city marshal or his employees in relation to the repairs mentioned in the complaint, and therefore they and each of them are irrelevant, incompetent and immaterial, and the court erred in permitting their introduction. But it might be urged that this error was harmless, to which we reply

that it was manifestly prejudicial, since thereby the plaintiff was permitted to attempt to prove to the satisfaction of the jury an essential element of her case, and especially since no other evidence was or could be adduced by her to establish that element, namely, the power and duty of the city marshal and his employees, if any they had, in relation to the work or repairs upon the drain, ditch, sewer, sidewalk or culvert, referred to in the complaint. The error of admitting these ordinances in evidence is plain, and that it was highly prejudicial is self-evident.

See the case of *Stebbins* v. *Mayer*, 16 Pac. 745.

At the request of the plaintiff the court gave to the jury Instruction No. 1, to which defendant excepted, and which said instruction is as follows: "You are instructed that the fundamental principle of the law of damages is that the person injured in his person or property rights shall receive compensation therefor, for which the person injured, if reasonable care and prudence were observed, is entitled to compensation to the full amount of the injury suffered." We contend that the giving of this instruction was prejudicial error. Taking this instruction as an abstract proposition of law, a mere reading of it convinces that it is incorrect. Its incorrectness is plain from its incompleteness; and when it is sought to apply such an instruction to a concrete case, especially to the case at bar, where no defense was made as to the nature and extent of plaintiff's injuries, or to the condition of the place where the same occurred, the incorrectness of that instruction was doubly apparent.

By so instructing the jury, it was in effect telling the members thereof that, from the mere fact that plaintiff was injured by falling into an excavation on a public street, that therefore she was entitled to recover damages against the city. The jurors' minds were thereby distracted from the question as to whether the city was negligent, and even from the question as to whether the injury was caused by plaintiff's negligence, and their minds were thereby solely centered upon the one question, namely, the injury itself, and the nature and extent

thereof. Such an instruction, without the qualifications here mentioned contained therein, is wrong in theory and vicious in practice.

*Samuel Platt* and *Alfred Chartz,* for Respondent.

By the Court, SWEENEY, J.:

Respondent obtained a judgment against the appellant in the sum of $5,000 for personal injuries on account of falling into an excavation made in one of the public streets of the city of Carson, which excavation was alleged to have been made by the appellant and negligently left unprotected. From the judgment, and from an order denying the defendant's motion for a new trial, defendant has appealed.

It is the main contention of appellant that the proofs failed to show that the excavation was made under the authority of the city trustees, or that they, with knowledge, ratified the acts of the persons who performed the work. It is the contention of appellant that the evidence shows, without conflict, that the work was done under the direction of the city marshal acting independently of the city trustees, and that there was no proof that he was authorized by the said city trustees to perform such work, nor was his act ratified by said trustees with knowledge of the circumstances. It is further contended upon the part of the appellant that the said city marshal, by virtue of his office, had no power to make the excavation, nor did he possess, by virtue of his office, any supervision over the streets and alleys of the city of Carson.

Section 10 of the act incorporating the city of Carson (Stats. 1875, c. 43, as amended by Stats. 1907, c. 29) provides "The board of trustees shall have the following powers : * * * 3. To lay out, extend or change the streets and alleys in said city and provide for the grading, draining, cleaning, widening, lighting or otherwise improving the same ; also to provide for the construction, repair, preservation, grade and width of sidewalks, bridges, drains and sewers and for the prevention and removal of

obstructions from the streets, alleys and sidewalks, drains and sewers of said city.  * * *"

It may be conceded, under this provision of the statute, that the control of the streets, sidewalks, and alleys of Carson City is exclusively in the hands of the city trustees, and that the city marshal, by virtue of his office, has no power or control over the same.   Whatever acts the city marshal may perform in relation to the streets, sidewalks, and alleys of the city must be by virtue of authority from the city trustees, or else they are, in law, but the mere acts of a stranger.

The excavation in question was made by one A. Lafreniere, who testified that he was employed by and acting under the general direction of the city marshal. The said Lafreniere testified that he had been in the employ of the city marshal for about four years prior to the accident in question, and that he was paid for his services by the city.   It also appears from the record that the said Lafreniere was the man generally in charge of the street work for the city.   While Mr. Lafreniere testified that he was employed by and acting under the direction of the city marshal in the matter of looking after the streets and alleys of the city, and while the marshal's testimony was to the same effect, it can hardly be said, we think, that both the city marshal and Mr. Lafreniere were not working under the direct authority of the city trustees.   All claims for services rendered were approved by the city trustees and paid by the city, and this condition of affairs is shown by the record to have existed for at least four years prior to the accident in question.   It cannot be said, we think, that a long-continued arrangement of this kind was not without the authority and approval of the city trustees who alone had legal authority in the premises.   Had the proofs shown that the city marshal and the witness Lafreniere had assumed to act only in the particular case which resulted in the injury to the plaintiff and respondent, it might well be contended that the city would not be bound by their acts unless by proof of special directions in this

particular case or by subsequent ratification with full knowledge of all the facts. Where it appears conclusively, however, that the work done upon the streets, which occasioned the accident, was in pursuance of a policy in reference to such streets that had existed for a number of years, it must be presumed that such policy was with the approval of the lawfully constituted authority.

However, whatever question there may be as to whether the work in question was done by lawful authority or was subsequently ratified, the same, we think, is removed from question in the case by the pleadings themselves. The answer of the defendant, appellant herein, sets up the following: "For a third, other, and affirmative answer and defense to plaintiff's complaint, defendant alleges and shows to the court as follows, to wit: That at the time mentioned in plaintiff's complaint, to wit, the 24th day of January, 1906, and for several days immediately prior thereto, a violent storm and precipitation of water occurred in Carson City and the vicinity thereof, necessitating defendant, by and through its employees, in different places to temporarily open drains and ditches in order to allow the flood waters to pass therethrough, and that because of said necessity defendant did on the said 24th day of January, A. D. 1906, at the place mentioned in plaintiff's complaint, partly open the plank covering of a drain ditch, and did temporarily remove therefrom accumulated debris and dirt for the purpose of allowing said flood waters to pass through, but that said act or acts of the defendant were rendered necessary by reason of the extraordinary and unusual conditions herein mentioned, and that said removal and deposit of said materials was temporary and was performed and caused to be performed by defendant in as reasonable and safe a manner as said existing conditions permitted."

From this alleged appellant's defense, it appears that the city authorities knew, prior to the accident, that a condition existed making it necessary to make repairs in the street at the place where the accident occurred, and

that it did make the excavation which occasioned the accident and resulting injury to the plaintiff, for which a judgment for damages was recovered in this case. There is here a clear admission in the appellant's answer of the only fact that has been argued upon the appeal as being unsupported by the evidence. The evidence is without contradiction that the excavation was left in the evening without lights to warn pedestrians of its existence and that, by reason of such negligence, the injury in question occurred. No question is presented upon the appeal that the damages were excessive.

Error is assigned in the admission of certain city ordinances over defendant's objection and in the giving of one instruction to the jury, but in the view we take of this case, even conceding, without so deciding, that the lower court erred in the admission of the ordinances or in the giving of the instruction, the same were without prejudice. When it was established upon the trial that the excavation was made in the street by the city and negligently left in the nighttime without proper lights to indicate the same, and that by reason thereof the plaintiff was injured, there was nothing left for the court and jury to determine but the amount of damages. As the other alleged errors did not go to the question of the amount of damages, the alleged errors, if any occurred, could not possibly have been prejudicial, hence we have given them no consideration whatever.

The judgment and order of the lower court are affirmed.